I'm going to try again to reserve three minutes for rebuttal, but we'll see. Maybe better luck this time. Good morning, Your Honors. I'm Allison Mendel for the Defendant Raymond Allen Thomas. There are two issues in this case, a Fourth Amendment issue and the other, the sentencing issue. I realize that there are some aspects of the sentencing issue that may be controlled by either cases that have been accepted en banc or by the U.S. Supreme Court. Right. I mean, I would think that the fact that the judge said significant, significant weight, how that is to be interpreted, I think, is possibly something that will be looked at at Rita and Claiborne, and if not, it's among the issues that we've already heard en banc in Cartes Vala. So you may want to not address that issue because there may be, and depending on those cases, we might ask for supplemental briefing. I'll just briefly address the facts on that issue when I get there and leave those complex legal issues for further enlightenment. The issue on the Fourth Amendment issue is also somewhat tortured. And there has been a recent decision of this Court that both sides have delivered the Court about since the briefing, and that was Arianna Ochoa. But I'm not sure that that really sheds much light on the circumstances of this case. What happened here was that Mr. Thomas was arrested after being dragged out of the arctic gantry of his home by an officer. And the issue before the Court is whether when he was standing in the arctic gantry behind the closed doors, whether he was within the confines of his home or whether he was on the threshold or outside of his home. Are there any cases that deal with that? With arctic gantries? No, there aren't. There was a witness at the suppression hearing, however, who described in great detail what an arctic gantry in Fairbanks looks like and what its purpose is and how people use it, which I think accurately explains to the Court the circumstances. And I think it's quite different than the facts in Arianna Ochoa, where people who live in cold but not quite so cold climates have a front door and a screen door, which are essentially inches apart. And the common Fairbanks setup is an entire separate room outside of the front door, which is kept closed at least in the wintertime. Is it removed in the summer, or does it remain there all year? No, it's a permanent structure. And it has, generally speaking, and in this case, based on the evidence here, it has a regular solid blocking front door on the inside and also on the outside. And at the outside door, there usually is, as there was here, a screen door or a glass storm door outside of the solid door. But, of course, it hasn't been. If that you are correct, and we were to treat that as part of the house and the arrest is illegal, you'd still have remaining issues to address. Yes, there are remaining issues to address. First of all, the government makes an argument that there was an exigency exception for the search of the home, which is not supported by the record below. There was no exigency argument. There was no facts on exigency. And there were no findings on exigency by the trial court. Based on the court's comments, I don't think that there could have been or would have been, since the court was concerned with why the officers didn't get an anticipatory warrant. Ultimately, they got a warrant. Yes. And they probably could get the warrant because they detected the package at the post office and followed the guy home. So where do we go from here? We can say that they shouldn't have arrested him. We can say that that first speech was not appropriate. But eventually, they had a warrant, which is probably okay. Well, the problem with the warrant that they got is that while it may be true that they could have gotten a warrant only with admissible facts that weren't a violation of the Fourth Amendment, the facts that they could have gotten the warrant on potentially were not in the warrant affidavit. There were ---- But what we do, I think, is excise the part that shouldn't be there and look at it. Yes, Your Honor. I agree. But what's left isn't enough, because the facts that the government is now relying on to legitimize the warrant were not in the warrant affidavit. For example, there was nothing in the warrant affidavit that connects the package with Mr. Thomas's home. They never said they saw him get out of the car with the package. They saw him take the package into the home or anything like that. So the ---- once you take out the fact that they found the theft powder in the package in his home, it's the link between ---- Well, let me just see what we do have. We have the package at the post office. I guess it's the post office. Yes. And that Stanley Hunt supposedly signed for that. Pardon me? Who signed for that? Somebody at the Hunt residence. I think it was Mr. Hunt. Right. Okay. And then they advise that it's still in the affidavit that a car arrives at this residence. Right. And out of that gets Mr. Thomas. Correct. And then he goes in there and they maintain this surveillance. And then the package goes off, if you will. Or, you know, the package alerts within how many minutes. I guess it's a couple hours later at that residence. Well, no, I think it's only a few minutes after he arrived. What happened in between, though, and this is ---- Oh, okay. They trace him to there first. Right. This has gone into a great length at the suppression hearing. Right. There was, I think, three hours when they followed him around town. He got in and out of the car. Other people got in and out of the car, the truck. So there was a lot of goings-on in between. But didn't they see him exit with the package that looks like the package that is the ---- No one ever says that. It's not in the ---- What's in the warrant? I don't think so. It says he exited the suspect residence carrying a package matching the description of the suspect parcel. He exited Mr. Hunt's residence three hours earlier. I'm sorry. But he has the suspect parcel with him, or at least according to them, he has something that looks like the parcel.  I misunderstood your question. Okay. They observed him leave Mr. Hunt's residence with the parcel. They didn't observe him three hours later that he still had the parcel. No, but then he goes back to his house, right? That's where we don't see the parcel. We don't have the parcel, but we saw him leave with the parcel from ---- They saw. They saw. They claim. And then he comes back to his house, but we don't know that he has the parcel. Correct. But then the parcel goes off at his house. Right. And I gather from the evidence of the trial that we're not talking some kind of GPS parcel that tells you where it is. It tells you that it's open. That it is. Right. Yeah. So there's a, you know, circumstantial tie between when he got home and when he went off that makes you think he's still got it. But those are facts that are put together after the fact. That's not exactly what the warrant affidavit says, because the warrant affidavit sketches out the circumstances but relies on actually seeing the package and the theft powder, so they don't go to a lot of trouble to tie him to the package in any other way. Do we have a Leon situation? I'm sorry. I don't. I'm not familiar with that case. Oh, yes. It's the good faith exception. Oh, yeah. Well, I am very concerned about what law enforcement did in this situation, and it does seem unreasonable that they didn't try to get a warrant since they knew who he was, the car was registered to him, they knew where he lived, and they followed him for three hours. So the judge at trial was somewhat confused about why they didn't get a warrant. And the whole situation where there was five or six law enforcement vehicles in his driveway, which then created some sort of an emergency, was a circumstance really entirely under the control of law enforcement. All right. We'll hear from the government. Thank you. Good morning, Your Honors. May it please the Court. I'm Joanne Farrington for the government in this case. This is one of those situations where the Court is facing a cascade of even ifs. And there's an array of different grounds on which the district court's decision that the evidence in this case should not be suppressed can be approved. Initially — Doesn't it all turn on the adequacy of the warrant? I'm sorry, sir. Doesn't it all turn on the adequacy, sufficiency of the warrant? Isn't that the bottom-line issue? Well, I think the warrant is plainly sufficient on its face as it stands. It is — it may be that if his arrest was unlawful and if the entry into the home was improper, that you could still approve this case by excising the two simple facts that were there. Why don't you assume that? Why don't you assume that the residue — that the arrest was illegal, therefore the residue can't be found on his hands? And if those were excised from the warrant, then you have the facts that we just discussed with Ms. Mendel, which are pretty thin. So would you address why, in your view, that would meet probable cause? Okay. I don't think that they're thin at all, as a matter of fact. The warrant describes in some detail the initial interception of the package, its proper search pursuant to warrant, the discovery of the cocaine, the delivery to the Hunts residence, the collection of the package by Mr. Thomas, his surveillance over the next couple of hours while he drove around in his pickup truck with the package, the fact that eventually he returned to his home, and a few minutes later, I mean, within a matter of minutes, the beeper went off, indicating that the package had been So just let me ask you, just to be clear, when the beeper goes off, we don't know where the package is, correct? We know — well, it is certainly reasonable to believe. No. Do we know where it is by the nature of this beeper? No. It's not a GPS beeper. So in other words, at, you know, headquarters central, they hear beeper goes off, means package has been opened. It could have been at Mr. Hunt's house, or it could have been — It could have been where it got dropped off somewhere else. No, it couldn't, in fact, because it only has a 100-guard range for the beeper to be tracked. That's, in fact, how they tracked and surveyed Mr. Thomas. That's not, unfortunately, set out in the warrant. Unfortunately, it's not in the warrant. Although I think that it — well, perhaps given your question, I think it's generally known that there is a limited range for these warrants, and so the officer probably didn't even think about putting in that — the range. So where was the beep heard, in the car or — No. The beeper is inside the package. I understand that, but where was it heard? The officers have a receiver that — And where was — — in their cars. And so where was the officer who heard it? He was parked just outside the driveway to Mr. Thomas's residence. Now, what does it say in the warrant about that? It says that he was followed to his residence. A short time later, he exited the suspect's residence. He entered his van and drove around. He was followed, and surveillance was maintained. He then arrived at his residence, and a few minutes later, Officer Stone observed that the tone's rhythm had changed, indicating that the package had been opened. Do we know where the officer was? We do know where the officer was, but it's not in the warrant. He doesn't describe where he is. He describes that he has followed the — Mr. Thomas to his residence. He doesn't say exactly where he's parked in the warrant. But, of course, I would like to back up in light of your concern about the sufficiency of the warrant to make it clear that initially, Mr. Thomas's arrest was lawful. He was outside the front door of his home at the time that the — the officer arrested him. I guess the question is, what is his front door? Yes. And, you know, this is an interesting illustration of the fact that there seem to be infinite varieties. You have a seemingly simple rule that officers can't enter someone's home except in the absence of exigent circumstances and probable cause to effectuate an arrest. And the Court has struggled with doors, adjusting side doors, in bed but within reach of the door, enclosed garages that are part of the home. But there — it is clear that once the front door, that solid barrier, semi-solid in the case of the screen door that the Court considered just recently, once the individual exits that front door into the places where the public comes in order to knock on your door if they're making a delivery or if they're a visitor, that they have left the sanctuary of the home, and they can be arrested at that point. What is the practice when, in the winter, does someone knock on the outer door or the inner door? With most Arctic entries, you can't hear it if you're inside the home and it's — and the outer door is knocked on. So they always leave the outer door unlocked? That is the normal practice, yes. And the record doesn't show exactly how it is set up here, although what it does show is that it's a small, enclosed space with an open screen door on the front. For most people, switch those doors out in wintertime to a solid storm door. This one was not switched. Would you — is this equivalent, in your view, to an enclosed porch? Exactly. It's exactly like an enclosed porch, except that normally there's a storm door put on in the front in winter in order to provide a buffer against the elements. There was a solid wooden door at the — it was about four feet long. There was a solid wooden door at the other end of this Arctic entry, which is the front door, into which the entry would be made into the home. Is the record clear here that that outer door was unlocked? It was closed, but the officer just opened it to make — effectuate the arrest, so it couldn't have been locked. Are there any State cases in Alaska on this point in terms of Arctic entries? I'm not aware of any, although I haven't researched the issue. I haven't heard of any cases of that sort. So, in essence, Mr. Thomas had come outside his door to find out what was going on, because his surveillance lights had gone off, and there was clearly a hubbub going on outside, and he was arrested. And that's clearly lawful. Beyond that, however, even if there is some concern about his arrest, there were not exigent circumstances. I think that this Court's decisions and the Supreme Court's decisions, and this Court's decision in Alamelo, which is outside of my briefs, and Curvey, California, make it quite clear that if the officers know there are narcotics inside a home and they have reasonable grounds to believe that the occupants of the home may be alerted that their cover is blown and the cops are there, that there are exigent circumstances to believe that the occupants of the home may be alerted.  make it quite clear that if the officers know there are narcotics inside a home and they have reasonable grounds to believe that the occupants of the home may be alerted  And the whole point of these controlled deliveries is to establish, beyond a reasonable doubt, that this person is the one who was getting the drugs and that he wasn't a mere convict. You don't need to establish it. I mean, if you have reasonable suspicion that he has the package that just got picked up from the post office, then you have reasonable suspicion to arrest him, and then if, in fact, it turns out to be that package, there you've got it. You absolutely do have reasonable suspicion to arrest him. But the point of this is to establish, beyond a reasonable doubt, that he was the one who was dealing the drugs, who was getting the drugs, and he's not simply a friend who agreed to pick up a package and give it to his actual drug-dealing friend. That he'd certainly be an accessory. He certainly would be, but the officer's hope was to prove that he was not just an accessory, that, in fact, he's the drug dealer. And in this case, it proved to be true. As Your Honor has observed, the sentencing issues in this case, I think, are all before the Court of Appeals, either the Court of Appeals and Bank or the Supreme Court. So I'm not going to address those now, and I believe my time is within seconds of being out. Thank you. Thank you very much. You have a minute for rebuttal. I just need to revisit this whole Arctic entry thing again. There's no point in an Arctic entry unless there's solid doors on both sides, because the whole point is to keep the heat in the house. That's what they're there for. So unless they have solid doors on both ends that close, it doesn't work as insulation. So while it's true that the solid door on the outside was standing open and there was a glass and screen door that was closed, there is a solid door there where it doesn't do any good. And I don't think there is a clear general practice about where you knock on the door or ring the doorbell. It depends. Some people have a doorbell on the outside. Some people have a doorbell on the inside. And almost everyone who has one leaves all their junk in the Arctic entry. So it's not, you know, you leave your coats, you leave your boots, you leave your, you know, snow shovels, whatever it is. So it's not the outdoors. Thank you. Thank you. Thanks to both counsel. Interesting, I guess, case of first impression of Arctic entries. The case of the United States versus Thomas is submitted.
judges: B. Fletcher, McKeown, Schwarzer